```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Barbara J. Martin,              :

      Plaintiff,            : Case No.  2:16-cv-796

   v.                           : CHIEF JUDGE EDMUND A. SARGUS, JR.

                                    : Magistrate Judge Kemp
Commissioner of Social Security,

      Defendant.            :

## REPORT AND RECOMMENDATION

### I.  Introduction

    Plaintiff, Barbara J. Martin, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits for a time period prior to January 1, 2012.  The application under consideration in this case was filed on May 1, 2008, and, as amended, alleged that Plaintiff became disabled on February 12, 2008.

    Plaintiff filed a civil action after her application was first denied.  <u>See Martin v. Comm'r of Social Security</u>, Case No. 2:12-cv-649 (S.D. Ohio).  In an order dated August 7, 2013, the Court remanded the case to the Commissioner for further proceedings pursuant to a joint stipulation of the parties.  In the meantime, Plaintiff had filed a second application for benefits, and it was granted with an onset date of January 1, 2012.  Consequently, benefits after that date are not at issue here.

    After remand, Plaintiff was given a further hearing before an Administrative Law Judge on July 17, 2014.  In a decision dated September 9, 2014, the ALJ denied benefits for the time period at issue.  That became the Commissioner's final decision on December 8, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on October 24, 2016. Plaintiff filed a statement of errors on March 1, 2017, to which the Commissioner responded on May 17, 2017. Plaintiff did not file a reply brief, and the case is now ready to decide.

II. <u>Plaintiff's Testimony at the Administrative Hearings</u>

Because this case is a continuation of the prior case, it is helpful to review Plaintiff's testimony at both the more recent administrative hearing and at the one held in 2010. The Court begins with the latter hearing. Plaintiff's testimony there is found at pages 32-44 of the record.

Plaintiff (who was 57 years old at the time of that hearing, and who has her GED) first testified that she had previously worked as a cashier. She worked thirty hours per week and lifted ten to fifteen pounds. Plaintiff also had a part-time job at a Senior Volunteer Service Program. She left that job due to back pain, fibromyalgia, and stress. Her employer was also late in making mileage payments.

Next, Plaintiff testified that she had back pain, which started in 1994 or 1995. She had had surgery, physical therapy, medication, and chiropractic treatment but her back was still painful. The pain radiated down her leg as well. Sitting in a recliner or lying in bed helped. Her medication affected her memory. On a typical day, she took her pain medication, ate breakfast, prayed, and then attempted to do chores. She had to brace herself anytime she stood up. She could sit for fifteen to twenty minutes and could shop for groceries, although she needed help bringing groceries into the house.

At the second hearing, Plaintiff's testimony, found at pages 621-37 of the administrative record, was as follows. She elaborated more on her past work, stating that when working at Rio Grande University (the volunteer coordinator position) she

did not have to lift much, and when at Family Dollar (the cashier position), she worked not only as a cashier but also stocked shelves, lifting up to 20 pounds.  That was also a part-time job.

Plaintiff also provided more testimony about her fibromyalgia.  She said she had been diagnosed with that condition in 2000 or 2001.  After the diagnosis, she continued to work because she needed the money.  After she had her spinal fusion done, she experienced pain in her lower back which radiated around to the front of her body and to her hips.  She was also experiencing pain in her left arm and in her hands due to arthritis.  She did not get restful sleep during that time period (2008-11).  Her memory problems began in 2005 or 2006, causing her family to worry if she was developing Alzheimer's disease.  Her doctor told her she was suffering from "fibromyalgia fog."  During the same time period, she had a foot surgery and still experienced some cramping in that foot, and her fibromyalgia caused pain in her back, arms, shoulders, and neck.

### III.  The Medical Records

The pertinent medical records are found beginning at page 225 of the first volume of the administrative record and at page 754 of the second volume.  The Court will focus primarily on the records of treatment from Dr. Higgins, since the ALJ's evaluation of his opinions forms the basis for Plaintiff's statement of error.

The Court begins its summary with a treatment note from Dr. Lee dated September 26, 2007.  That note shows that Plaintiff had a history of fibromyalgia and that her symptoms were "stable" at that time although she noticed some increase in symptoms after heavy activities.  Her trigger points were all tender at that visit.  She received an injection for bursitis.  Prior treatment notes from Dr. Lee are similar and show that fibromyalgia had been diagnosed five or six years before.  (Tr. 275-81).

Plaintiff was still working when most of these notes were made. She attended physical therapy sessions in 2008 but those sessions were discontinued due to pain.

Plaintiff began seeing Dr. Higgins in 2008 as a result of a referral from her surgeon. She presented with complaints of aching in her neck, burning in her shoulders, and pain in her low back and knees. She also reported some numbness in her hands and feet and bilateral weakness in her legs and back. Sitting, standing, and walking for more than thirty minutes at a time were problematic for her. Examination findings included tenderness to light touch and decreased lumbar range of motion. Dr. Higgins concluded that her diffuse pain was from fibromyalgia and he changed her medication, with a plan to follow up every six weeks. (Tr. 487-88). Treatment notes from 2009 and 2010 show that Plaintiff continued to be seen for "multiple somatic complaints" and that her condition was essentially unchanged. She continued to show tenderness along the fibromyalgic tender points. In November of 2009 she reported improvement with physical therapy but said that standing or walking over ten minutes made things worse. She also reported moderate difficulty doing home chores and noted that she was "retired." In February, 2010, Plaintiff said she had both muscle and joint pain and was experiencing weakness in the left arm. Her gait was antalgic, probably due to her having had bunion surgery. No trigger points were evident at that time. (Tr. 489-91).

Dr. Higgins' first opinion was expressed in a physical capacity evaluation dated March 4, 2010. Dr. Higgins indicated that, since May of 2008, Plaintiff could lift and carry only five pounds, could sit for four hours, could stand for four hours, had to alternate between those two positions every fifteen minutes, could occasionally twist, stoop, bend, and climb stairs, and could never crouch or climb ladders. She could also reach

overhead or push and pull only occasionally, and she had to avoid vibration and hazards.  He also said she had a mental impairment that affected her ability to deal with even simple work instructions and decisions  (Tr. 508-11).

The next treatment note from Dr. Higgins is dated May 3, 2010.  At that time, Plaintiff's symptoms were being partially controlled by Elavil, Neurontin, and Vicodin.  Medications, resting, and reclining all helped with the pain, while standing and sitting too long made it worse.  Again, no trigger points were present.  Neither that note nor the prior one indicated a diagnosis of fibromyalgia.  Dr. Higgins increased Plaintiff's dosage of Elavil but otherwise kept her treatment the same.  (Tr. 498).  He saw Plaintiff twice more in 2010, noting in August that she was doing a little better, but walking or standing for more than five minutes was still an issue, and that she was also experiencing bilateral shoulder pain.  Again, no trigger points were noted but seated straight leg raising was positive on the right.  She was encouraged to continue with shoulder and low back exercises.  At the October, 2010 appointment, Plaintiff said she felt worse, perhaps due to the onset of cold weather.  She said she could do most of her activities of daily living and she had been helped by chiropractic care.  Her physical examination was the same as at the prior visit, and some medication adjustments were made to try to help with her back pain and radiculopathy. (Tr. 527-28).

There are additional treatment notes from Dr. Higgins for late 2010 and for 2011.  On December 10, 2010, Plaintiff reported feeling better, but the note indicates some forgetfulness which might be related to medications.  In February, 2011, she was about the same, but said her symptoms were under reasonable control.  No trigger points could be identified.  The next examination was much the same, but in June, 2011, she reported

feeling confused after increasing the dosage of her Neurontin.
Her physical examination was basically normal except for
tenderness in the lumbar spine and decreased lumbar range of
motion. Plaintiff reported some new areas of pain in August,
2011, but she also said that her pain level was 4 out of ten and
she could do self-care and drive a car. She was a little worse
at the October, 2011 visit although her back pain was about the
same. She took prednisone after that visit and said in November,
2011, that it had helped. As with most visits, the physical exam
did not reveal any tender points or muscle spasms, her gait was
intact, and her transfers were intact as well. Fibromyalgia was
described as "possible" and Cymbalta was prescribed. (Tr. 869-
81). In December, she was again doing better, although still
reporting some issues with cognition. (Tr. 888). There are no
other treatment notes from Dr. Higgins prior to the last date of
the period under review.

Dr. Higgins wrote a letter dated February 24, 2013,
outlining his views of Plaintiff's medical status. He said that
he was treating her for multiple medical conditions and that she
also suffered from depression, which aggravated her
musculoskeletal issues. Her symptoms were also aggravated by
extended movement and overuse and by remaining in one position
for an extended period. He also believed that "fibromyalgia fog
can limit her ability to concentrate...." From a physical
capacity standpoint, Plaintiff was capable of walking for ten to
fifteen minutes at a time and for no more than two hours in a
day, had to change positions every fifteen minutes, should not
lift over ten pounds, should not reach overhead, could not bend
or stoop, and would miss work 2-4 times per month. Her prognosis
was fair. (Tr. 895-96).

Two state agency physicians reviewed the records and
expressed opinions about Plaintiff's physical residual functional

capacity. Dr. Bacalla concluded that Plaintiff could do a relatively full range of light work, with some restrictions on climbing, stooping, and crouching. (Tr. 410-17). Dr. Rees subsequently reviewed that opinion and concluded that the "evidence in the file does not support reducing light RFC." (Tr. 882).

### IV. The Vocational Evidence

At the second hearing, Connie O'Brien testified as a vocational expert. Her testimony begins at page 637 of the administrative record.

Ms. O'Brien began by identifying and classifying Plaintiff's past jobs. She said that Plaintiff was a cashier stocker, which is light and has an SVP of 3, and was also a volunteer coordinator, which is sedentary with an SVP of seven.

Next, Ms. O'Brien was asked questions about a hypothetical person who could work at the light exertional level but who could not climb ladders, ropes, or scaffolds and could stoop and crouch only occasionally. She said that such a person could do both of Plaintiff's past jobs.

Responding to questions from Plaintiff's counsel, Ms. O'Brien next testified that someone who could sit for four hours and stand for four hours a day, who had to alternate between sitting and standing every fifteen to twenty minutes, who could lift five to ten pounds frequently, who could occasionally twist, stoop, bend, and climb ladders, and who had to avoid exposure to workplace hazards, could not work as a cashier stocker, but could still perform the volunteer coordinator job. However, if the person were off task for ten percent of the work day, that job could not be done either.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 596-607 of the administrative record. The important findings in

that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act at all times relevant to his decision. Second, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including fibromyalgia and degenerative disc disease of the spine. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could work at the light exertional level except for occasional stooping and crouching. Also, she could not climb ladders, ropes, or scaffolds.

With these restrictions, the ALJ concluded that Plaintiff, could do her past relevant work as a cashier stocker and as a volunteer coordinator. A person who can do his or her past relevant work is not disabled under the Social Security Act. Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI. Plaintiff's Statement of Errors

In her statement of errors, Plaintiff raises a single issue – that the ALJ erred by not assigning any weight to the opinions of the treating source, Dr. Higgins. The ALJ's decision is reviewed under this legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion'" Richardson v. Perales, 402
U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.
NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere
scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th
Cir. 1976). The Commissioner's findings of fact must be based
upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435
(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th
Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir.
1984). In determining whether the Commissioner's decision is
supported by substantial evidence, the Court must "'take into
account whatever in the record fairly detracts from its weight.'"
Beavers v. Secretary of Health, Education and Welfare, 577 F.2d
383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human
Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court
would reach contrary conclusions of fact, the Commissioner's
decision must be affirmed so long as that determination is
supported by substantial evidence. Kinsella v. Schweiker, 708
F.2d 1058, 1059 (6th Cir. 1983).]

Since Plaintiff's sole statement of error deals with Dr.
Higgins' opinions, the Court will begin by setting out exactly
what the ALJ had to say on that subject. After summarizing the
two opinions in question, he concluded:

> I cannot give any weight to either of Dr. Higgins'
> opinions for the following reasons. First, these
> opinions are at odds with each other without any
> significant change in the claimant's objective findings
> or subjective complaints showing improvement which Dr.
> Higgins' more recent assessment indicates. Second, Dr.
> Higgins is not a psychiatrist. Yet he first indicates
> that the claimant's mental impairment would affect her
> ability to perform stressful work but later says that
> her fibromyalgia "fog" would affect her work. Third,
> considering that fibromyalgia is primarily a symptom
> based impairment on which Dr. Higgins[] based is
> opinions, and explained in more detail below, the
> claimant's assertions regarding her symptoms are not

-9-

> entirely credible. And fourth, the evidence does not
> support the claimant's assertions prior to her
> established onset date of January 1, 2012. Physical
> examinations show only intermittent trigger/tender
> points, and there was no weakness or neurological
> deficit. Gait was unimpaired, and, in fact, the
> claimant reported that her pain had improved with
> prednisone and other treatments.

(Tr. 603). The ALJ, by contrast, gave great weight to the opinions of the two state agency physicians because they were "well supported by the evidence of record" which showed that although Plaintiff had significant disc disease and limitation in the range of motion of the lumbar spine, her clinical examinations showed "no neurological deficits, no weakness, and no substantial gait abnormality." (Tr. 602).

Plaintiff attacks these findings on a number of fronts. She argues that Dr. Higgins' two opinions are, rather than contradictory, "strikingly similar," Doc. 18, at 20, that the fact that Dr. Higgins is not a psychiatrist has no bearing on the validity of his opinions about Plaintiff's physical abilities, that the supposedly less-than-credible report of symptoms formed only part of the basis for Dr. Higgins' opinions, and that the medical records do show substantial abnormalities on examination. The Commissioner responds that the record fully supports each reason given by the ALJ to discount Dr. Higgins' opinions and that the reasons he articulated are sufficient to justify giving little or no weight to Dr. Higgins' conclusions.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating

-10-

physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The first reason given by the ALJ to discount Dr. Higgins' opinions was that they indicated different restrictions even though it did not appear that Plaintiff's physical condition had changed much in the time elapsed between the two opinions. There are some inconsistencies in the opinions, but the basic restrictions are similar, although the latter opinion is a bit more restrictive. Also, given the fact that they were rendered almost three years apart and that Plaintiff's condition was not completely stable during that time period, some inconsistencies might be expected. This reason, standing alone, would probably not support the ALJ's rejection of Dr. Higgins' opinion, but it was not the only reason given.

The second point made by the ALJ was that Dr. Higgins is not a psychiatrist, but he did express opinions on mental health issues. That is true. His first opinion referred to an unspecified mental impairment which, in his opinion, was so severe that Plaintiff could not understand, remember, and carry

-11-

out even simple instructions or make simple work-related decisions.  His second opinion mentioned "fibromyalgia fog" but also indicated that Plaintiff suffered from depression and that her depression aggravated her musculoskeletal condition.  The ALJ was entitled to discount those portions of both opinions because of Dr. Higgins' lack of expertise in the area of mental impairments and because he provided no treatment for either depression or any other mental impairment.  The fact that the ALJ also found, based on other evidence, that Plaintiff did not have a severe mental impairment - a finding not challenged here - supports his determination on this issue as well.

    Next, the ALJ cited to the fact that fibromyalgia is a symptom-related disease and to his finding that Plaintiff was not entirely credible in reporting her symptoms.  It is clear that objective evidence is not particularly helpful in determining the extent to which fibromyalgia may cause disabling symptoms, and ALJs have been criticized for relying overly much on the absence of objective evidence in denying a claim based on fibromyalgia. See, e.g., Preston v. Sec'y of HHS, 854 F.2d 815, 818, 820 (6th Cir. 1988).  Some courts have noted that traditional factors under which a claimant's credibility is normally evaluated, like the ability to do daily activities, may also not be very probative in a fibromyalgia case.  See Cooper v. Comm'r of Social Security, 2014 WL 4606010 (E.D. Mich. June 17, 2014), adopted and affirmed 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014).  Cooper also recognizes that these problems make a treating source opinion more critical in such cases, but stresses that "treating source opinions are not always deferred to in fibromyalgia cases." Id. at *18.  Rather, the ALJ still has the duty to evaluate the claimant's credibility, especially as to the existence of disabling symptoms (as opposed to the existence of fibromyalgia as a severe impairment), and the courts still defer to that credibility assessment when it is properly supported.

Id. Cooper concludes its review of the pertinent law in this area with this observation, with which this Court agrees fully:

> Despite the variability in decisions resulting from the largely factual inquiry necessary in fibromyalgia claims, the guiding principles from the case law are discernable. Courts should be wary of an ALJ's rationale for denial that relies on the lack of objective evidence, a claimant's ability to complete personal tasks, and a conservative treatment approach. Instead the analysis must be sensitive to the subjective nature of fibromyalgia and give due deference to treating sources. This does not mean, however, that the traditional factors are summarily disregarded. Finally, the ALJ's explanation of internal contradictions or questionable evidence in treating source opinions still provides a sufficient basis to uphold the finding.

Cooper, 2014 WL 4606010 at *21.

The absence of a direct attack on the ALJ's credibility determination makes it difficult for the Court to find that his use of that finding in discounting Dr. Higgins' opinions was not reasonable. The cases stress that credibility is a very important factor in fibromyalgia cases and that an ALJ not only can, but must, take the claimant's credibility into account in deciding how much weight to give to the opinions of her treating physician. The Court has examined the ALJ's credibility finding only in the context of whether it had some basis in the record, and although there are portions of it which do not appear to relate directly to fibromyalgia, such as the lack of objective findings or the lack of specialized care (but these factors are pertinent to her back condition), it is also supported by the ALJ's finding that despite a long history of fibromyalgia, for pertinent periods of time, Plaintiff could work and engage in a wide range of activities, and by his finding that there were some inconsistencies in her testimony and her description of symptoms. The ALJ also cited her sparse work history and the fact that she

said she quit her last job due to issues with payment and not for health reasons. (Tr. 604-05). Plaintiff does not argue that these findings are unsupported by the record, and the ALJ was therefore allowed to use them as a proper basis for giving less weight to opinions based largely upon her subjective statements to her doctor.

The last reason cited by the ALJ was the lack of support for Dr. Higgins' opinions in the medical records. Plaintiff points out that the medical records do contain various objective findings, but that is not the issue. The ALJ credited many of these reports in concluding that Plaintiff was limited to a reduced range of light work. He also noted, correctly, that most of the time when Plaintiff was examined by Dr. Higgins, she did not show trigger point tenderness, which is a hallmark of fibromyalgia, and that his records show that her pain was, at many times, under good control. The ALJ is entitled to make these types of judgments. Finally, the Court notes that even if Plaintiff were limited physically as described in the first of Dr. Higgins' opinions - that is, to sedentary work with a sit-stand option - the vocational expert testified that Plaintiff could do one of her past jobs, which was a sedentary job. The only part of that opinion the ALJ had to reject in order to deny Plaintiff's claim concerned her unspecified mental impairment, and, again, Plaintiff did not challenge the ALJ's finding that she did not have a severe mental impairment. Under these circumstances, the ALJ's conclusion that Plaintiff could do at least the volunteer coordinator job is supported by substantial evidence, and that precludes the Court from reversing the Commissioner's denial of benefits.

VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge